UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. **15 - 3447 - BLG**

IN RE: CRIMINAL COMPLAINT

_____/

**SEALED,**     <u>**CRIMINAL COVER SHEET**</u>

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

                                             Respectfully submitted,

                                             WIFREDO A. FERRER
                                             UNITED STATES ATTORNEY

BY: _____
        ANTHONY W. LACOSTA
        ASSISTANT UNITED STATES ATTORNEY
        Court No. A5500698
        99 N. E. 4th Street
        Miami, Florida 33132
        TEL (305) 961- 9280
        FAX (305) 536-4676
        anthony.lacosta@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| United States of America | ) |
| v. | ) |
|  | ) Case No. 15 - 3447 - BLG |
| Yuri Millan, Oriel Ugardes, and Jose Guim. | ) |
|  | ) |
|  | ) |

*Defendant(s)*

## SEALED   CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __2009 through June 20, 2014__ in the county of __Miami Dade__ in the
__Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiry to commit wire fraud (deprivation of honest services) in violation of 18 U.S.C. § 1343 and 1346; and |
|  | Conspiracy to give bribes to a public official, or accept bribes as a public official, in connection with a state or local government agency receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(B) and (a)(2); |
|  | As more fully described in the Attached Affidavit |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT OF FBI SPECIAL AGENT DONALD MORIN II

☑ Continued on the attached sheet.

_SA Donald P. Morin, II_
*Complainant's signature*

FBI Special Agent Donald Morin, II
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __11/06/2015__

_Barry L. Garber_
*Judge's signature*

City and state: __Miami, Florida__   Barry L. Garber, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Donald P. Morin, II being duly sworn, depose, and state as follows:

### Introduction.

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since 1999. I am currently assigned to the Miami Division of the FBI where my investigative responsibilities include public corruption and civil rights matters. In my work with the FBI, I have conducted numerous investigations concerning violations of federal laws by public officials.

2.      This affidavit is provided for the limited purpose of establishing probable cause for the arrest of **Yuri Millan, Oriel Ugardes,** and **Jose Guim**. The facts in this affidavit are intended to establish probable cause to believe that **Millan, Ugardes, Guim**, Elina Rodriguez, and other known and unknown persons have conspired to commit the following crimes, all in violation of 18 U.S.C. § 371:

   a. 18 U.S.C. § 666(a)(1)(B);
   b. 18 U.S.C. § 666(a)(2); and
   c. 18 U.S.C. § 1343 and 1346.

3.      The facts described in the affidavit are known personally to me, or have been provided to me by other law enforcement personnel. Because the facts are intended for the limited purpose of establishing probable cause, they do not describe every fact known to me regarding this investigation.

### General Allegations.

4.      Between May 5, 2003, and August 18, 2014, Defendant **Yuri Millan** was employed as a sworn Miami-Dade Police Department (MDPD) police officer. During the time period described below, **Millan** was a uniform officer assigned to the Midwest District of Miami Dade County.

5.      As of May 2, 2014, Elina Rodriguez had been working as a MDPD Public Service Aide (PSA) for approximately 17 years. During the timeframe of the events described below, Rodriguez was assigned to uniform duties in Miami Dade County. A PSA is a uniformed MDPD employee whose work involves nearly all duties as performed by police officers. The chief difference between a PSA and an officer is enforcement powers, that is, a PSA cannot make an arrest. A PSA does have access to law enforcement databases and is used for a variety of non-hazardous law enforcement functions. For example, MDPD PSAs will respond to and process motor vehicle accidents, write accident reports, issue tickets and summons, testify in court, and perform other duties as required.

6.      During all times relevant to the facts alleged in this affidavit, Defendant **Oriel Ugardes** was the owner of O&U Towing. O&U Towing is a wrecker company that had at least

three company tow trucks (a/k/a "wreckers"). In addition to owning the company, **Ugardes** himself operated one of the three company trucks. Jose Guim operated another one of the O&U company wreckers. At no time during the events described below, was O&U, **Ugardes**, or **Guim** an authorized MDPD rotational wrecker service or operator.

7. Miami Dade County Police Department is a local government agency that has received in excess of $10,000 federal funding through grants during any one year period from 2009 to the present. For example, paperwork at the department has confirmed MDPD's receipt of the following federal funds through the Edward Byrne Grant program administered through Department of Justice:

| Date | Approx. Amount | Grant Program |
|---|---|---|
| 21SEP2010 | $90,095.32 | Edward Byrne Grant – DOJ |
| 23NOV2010 | $127,274.27 | Edward Byrne Grant – DOJ |
| 12MAY2011 | $46,737.99 | Edward Byrne Grant – DOJ |
| 11OCT11 | $4,608.73 | Edward Byrne Grant – DOJ |
| 18APR12 | $13,843.17 | Edward Byrne Grant – DOJ |
| 06NOV12 | $38,752.48 | Edward Byrne Grant - DOJ |
| 12JUN13 | $96,560.71 | Edward Byrne Grant – DOJ |
| 28OCT13 | $41,509.11 | Edward Byrne Grant – DOJ |
| 24APR14 | $521,580.39 | Edward Byrne Grant – DOJ |
| 18JUL2014 | $97,461.63 | Edward Byrne Grant -DOJ |
| 23APR2015 | $288,219.30 | Edward Byrne Grant –DOJ |

8. MDPD employees owe their employer (MDPD) and the public a fiduciary duty. Both officers and PSAs are prohibited from accepting bribes and gratuities related to their official duties. According the MDPD departmental orders, "Employees shall submit a written report of any bribe attempt, actual or suspected, to a supervisor within their chain of command not later than the end of the duty tour, or within eight hours if off duty. The concerned supervisor will determine and document the subsequent course of action in coordination with Police Legal Bureau."

### MDPD's Rotational Wrecker System.

9. Miami-Dade County has a rotational wrecker system. A rotational wrecker system is a process where certain tow companies contract with the County to be placed on a

rotational wrecker list for various geographic areas within MDPD's jurisdiction. When there is a traffic accident, police regulations require the officer to contact dispatch if the stranded motorist requests a tow and then dispatch will contact the designated towing company for that geographic area. Because the county has a rotational wrecker system, it is against Florida state law for tow trucks to approach stranded drivers and solicit business directly. Within the towing industry, tow truck operators that attempt to circumvent the rotational wrecker system and illegally solicit business from stranded motorists are known as "pirates."

10. Because of the large number of accidents in Miami Dade County, a position on the rotational tow list is lucrative for both the towing company and for Miami Dade County. In regard to the County, each time that the designated rotational tow company makes a tow as a result of the contract, that company must pay approximately $15 to Miami Dade County. In regard to the rotational tow company, that company gets to tow wrecks from the scene and, also, if necessary can make money on storage costs and other incidentals. Thus, when a pirate obtains business through illegal solicitation, both the public entity and private company lose money.

### The General Scheme.

11. Since 2013, your affiant and other investigators on an FBI Task Force have been investigating corruption allegations related to the towing and auto-collision industry. Through work on this investigation and speaking with investigators who have conducted a similar investigation, your affiant has learned that tow truck drivers and collision repair centers will pay police officers and public service aides (PSAs) to assist with pirate wrecking schemes.

12. From work on this and related investigations, your affiant has learned that schemes involving police officers and/or PSAs illicitly steering business toward tow truck operators can work in different ways. Two common methods are as follows: First, through improper use of the police computer, a corrupt police officer or PSA can track accidents as they occur and then send that information, without authorization, directly to a pirate tow truck operator.[1] That tow truck operator can then respond to the scene and attempt to solicit business from the crash victims. Second, if there is a corrupt police officer or PSA at the scene, a pirate tow truck driver may illegally solicit business at that scene without the risk of being arrested or ticketed for illegal solicitation. Further, in some instances, that police officer or PSA will refer the victim driver directly to the pirate tow truck operator or, alternatively, refrain from contacting dispatch as required by police procedure and instead permit the pirate wrecker operator time to respond to the scene and illegally solicit business.

---

[1] "Holding" is a term used by police (and pirate tow truck drivers) to describe accidents that have been reported to police dispatch (911) but that have not yet been assigned a responding officer or PSA. The location of these reported accidents will be listed on the police department computer system (CAD) as "holding." Because the accidents have not yet been assigned over police radio frequencies, information regarding these holding calls is especially valuable to pirate tow truck drivers. With this information, a pirate tow truck operator can beat other competitors to the accident scene, even those with their own police scanners. Also, because the call is not yet assigned, a pirate with this information also has a better chance of beating responding police units to the accident scene, allowing the pirate to illegally solicit the stranded driver without interference.

13. As described below, your affiant developed probable cause to believe that Oriel **Ugardes**, Jose **Guim**, Yuri **Millan**, Elina Rodriguez and other known and unknown persons participated in a pirate tow scheme. The way the scheme worked, as documented below, is that **Ugardes** would pay cash to Rodriguez and **Millan**, either directly or through **Guim**, in return for Officer **Millan** and PSA Rodriguez using their official positions to assist **Ugardes** and other O&U drivers (such as **Guim**) locate accidents and illegally solicit business from stranded drivers. When **Ugardes, Guim** or other O&U drivers were successful, they would tow the disabled vehicles to auto-collision repair centers that would pay cash kickbacks for the business. **Ugardes** and **Guim** would then pay the public employee for their role in acquiring the business, that is, a cash payment usually between $100 and $300 *per* vehicle.

### The early investigation.

14. In April 2013, the FBI infiltrated two confidential sources (CS-1 and CS-2) into Oriel **Ugardes**'s company, O&U Towing. **Ugardes** provided CS-1 and CS-2 one of the three O&U tow trucks. **Ugardes** explained that if CS-1 and CS-2 made a successful tow, they would have to share 50% of the kickback paid by the garage with **Ugardes**, minus approximately $200 cash that would be paid to the law enforcement employee responsible for the business. CS-1's and CS-2's description of the payment structure was corroborated by consensually recorded conversations with **Ugardes**.

15. For example, on April 29, 2013, **Ugardes** was recorded speaking with CS-1 regarding paying an unnamed police contact $200 for each successful tow, regardless of the condition of the vehicle in the accident. **Ugardes** explained that the unnamed officer concealed **Ugardes**'s solicitation by falsely instructing dispatch that the driver had arranged his own tow, and that the rotational wrecker was therefore not needed.

### Four Examples of Pirated Tows.

16. Between April 2013 and May 2014, through consensual recordings, court-authorized intercepts on **Ugardes**'s cellular telephone, surveillance, interviews, and collection of records, investigators have documented the participation of **Ugardes, Guim, Millan** and Rodriguez in the conspiracy. The following incidents are described for the purpose of illustrating each participant's role in the conspiracy.

*December 19, 2013.*

17. On December 19, 2013, **Guim** called CS-1 and reported that there was an accident located at S.W. 97th Avenue and 8th Street. CS-1 drove to the accident scene in the O&U wrecker. When CS-1 arrived at that scene, **Millan** was present at the scene in uniform. **Millan** acknowledged CS-1 and advised CS-1 to speak with the drivers of the damaged vehicles. When CS-1 solicited the drivers for business, **Millan** approached a FHP trooper who arrived at the scene and asked the trooper to allow CS-1 to make the tow. The FHP trooper told CS-1 that CS-1 could make the tow after the trooper left the scene of the accident.[2] The driver of a 2008

---

[2] The FHP Trooper completed an accident report for this accident. That report has been recovered by the FBI. The report confirmed, as reported by CS-1, that an accident occurred at S.W. 9th Avenue and 8th Street and that it involved a 2008 Toyota. The report estimated the damage to the vehicle was $5,000.

Toyota agreed to be towed from the scene. CS-1 took the Toyota to Garage 2, a garage located in Miami Dade County that **Ugardes** had previously instructed CS-1 to use when towing damaged vehicles.

18. After dropping the Toyota off at Garage 2, the owner at Garage 2 paid CS-1 $800 cash. Investigators have reviewed the corresponding repair file. That file indicates that Garage #2 was paid $2,978.40 for 23 days of storage and other associated fees. The O&U tow slip in the file omits reference to the kickback. On the back of the file, however, is a handwritten notation for "800" that corresponds with the amount of the reported payment.

19. After CS-1 was paid by Garage 2, CS-1 contacted **Guim** during a recorded telephone call. During the call, CS-1 asked about the money owed MDPD Officer Yuri **Millan** for assisting the tow:

> CS-1: Hey, Pipo, I already – I already have … that—that – that money there, 100 for him right? For Yuri?"
>
> **Guim**: Yes, yes, that's [UI] the same – the same as the Monster [la Monstra].[3]

CS-1 and **Guim** continued the conversation and discussed where they could meet so that CS-1 could provide **Guim** the money owed **Millan**.

20. Later that same day, **Guim** met with CS-1 for the purpose of collecting **Millan**'s money and **Ugardes's** share of the kickback paid by Garage 2's owner. During that recorded meeting, **Guim** told CS-1 that **Millan** had called him and there was another accident on 82 and Coral Way. **Guim** indicated that the accident had not yet been called in, meaning that a police officer or PSA had not yet been dispatched to the accident scene. CS-1 indicated he would respond, but before CS-1 left, CS-1 provided **Guim** $230 cash for delivery to **Ugardes** and $100 cash for delivery to **Millan**.[4] **Guim** then provided CS-1 the address of the reported accident again and CS-1 left the meeting.

21. Investigators have confirmed through an interview of the Toyota's driver that the driver did not contact O&U towing to arrange a tow.

*January 9, 2014.*

22. On January 9, 2014, CS-1 drove an O&U wrecker to an accident scene being worked by MDPD PSA Elina Rodriguez. At that scene, Rodriguez permitted CS-1 to tow a damaged vehicle (a Honda) from the accident scene in PSA Rodriguez's presence, despite O&U

---

**Millan**'s MDPD daily activity report confirmed that he was at the accident scene. **Millan** indicated that he was assisting another officer and wrote "NR" to indicate that he did not generate a report related to his assistance.

[3] "La Monstra" is the nickname that **Ugardes** and **Guim** used to refer to MDPD PSA Elina Rodriguez.

[4] **Guim**: "How much we have to give Oriel?" CS-1: Two thirty. **Guim**: And the 100 here -- CS-1: and the 100 for – for Yuri. **Guim**: Okay.

not being a rotational wrecker. CS-1 delivered the damaged vehicle to Garage #2, where CS-1 reported being paid a $1,200 cash kickback from the garage. The corresponding garage file has a handwritten notation of "1200.00" on the back, with no explanation of what that means.

23. The other vehicle involved in this accident was a Toyota. Before leaving the scene, in Rodriguez's presence, CS-1 provided the O&U Towing card to the Toyota's driver. While the Toyota's driver initially removed the Toyota from the scene himself, the Toyota's driver has informed investigators that he subsequently used the card to call the tow truck company and have his car towed to the garage. **Ugardes** told CS-1 that he received $1,500, but the notation on the back of the repair file says "1600."

24. Garage #2's owner provided the accident files to investigators in response to a subpoena. These records confirm the delivery of the Honda and the Toyota to Garage #2. The repair file for the Honda confirms the vehicle was salvaged for $3,742.60. The repair file for the Toyota documents that State Farm Insurance paid more than $10,000 for repair job on the Toyota. While the file for the Toyota contains a tow slip for O&U Towing, the file for the Honda is missing the corresponding tow slip. In the Honda file, there are tear marks on the salvage company check that is the location where the tow slips have been stored in the vast majority of the Garage #2 repair files. There are also staples remaining in the file in the position where the tow slip was usually attached, but in this case the paperwork is missing, but the staples have been left in place.

25. Investigators have recovered Rodriguez's crash report that describes the accident that occurred within Miami Dade County. The crash report correctly notes the Honda was towed by O&U Towing and the Toyota was removed by the driver. The report omits reference to the unsolicited appearance of a non-rotational wrecker at the accident scene, and that Rodriguez was being paid for ignoring O&U tow truck drivers' solicitation of business at her accident scenes.

*February 13, 2014.*

26. In regard to an accident occurring on February 13, 2014, CS-1 reported to law enforcement that **Guim** towed a 2010 Honda to Garage #1. CS-1 also reported that **Millan** was the police officer assigned that accident scene.

27. On the date of the reported accident and resulting tow, the FBI intercepted and recorded conversations between **Guim**, **Ugardes**, and an owner of Garage 1 over the telephone regarding the solicitation of business from the 2010 Honda Odyssey's driver. During one of the recorded calls, **Guim** told **Ugardes** that the vehicle at the accident scene was a 2010 and it was a "good hit." **Ugardes** asked **Guim** if the vehicle was "hooked already," and **Guim** indicated that "el pelotero" [the baseball player] was at the accident scene.[5] **Ugardes** responded "it's done," meaning that towing the 2010 Odyssey would not be a problem.

---

[5] During his interview, which is described below, MDPD Officer Yuri Millan indicated that he used to play baseball competitively and, more recently, had been playing softball in his free time.

28. After this call with **Guim**, the FBI intercepted and recorded a call from **Ugardes** to Garage 1's owner. **Ugardes** advised Garage 1's owner to have an employee stay late because "a car, a 2010" was being towed to the owner's business. Additional conversations regarding the delivery of the vehicle were also recorded.

29. Review of Garage 1's repair file has confirmed that a 2010 Honda Odyssey was delivered to Garage 1 by an O&U vehicle. The repair file indicates that the State Farm Automobile Insurance Company paid more than $12,000 for repair of the Honda. Your affiant also knows, through interviews of other tow truck drivers, that Garage 1's business practice was to pay a cash kickback for the delivery of a vehicle.[6] Based upon the information your affiant has received to date, the kickbacks were generally 15% of the anticipated repair cost for the vehicle.

30. The owner of the 2010 Honda Odyssey has been interviewed and confirmed that he/she did not call O&U Towing for a tow. The owner indicated that he/she thought the police must have called because after the accident, the tow truck arrived on scene. The owner stated the tow operator solicited his/her business, and towed the owner's car to Garage #1.

31. Review of MDPD records confirms that on the date in question, **Millan** was the officer assigned to an accident occurring in Miami Dade County that involved the 2010 Honda Odyssey. **Millan**'s accident report did not describe **Guim**'s illegal solicitation. To the contrary, **Millan** falsely indicated in the accident report that the Honda Odyssey was removed by the driver, when in truth, that vehicle had been towed from the accident scene by an O&U tow truck.

32. After the 2010 Honda Odyssey had been delivered to Garage 1, the FBI intercepted and recorded a telephone call between **Guim** and **Ugardes** where they discussed cash consistent with the money being paid Millan for each tow:

> Guim: ...but, but, but what do you call it. If we can take $100 more or from, what do you call it , of , of, out . . .
>
> Ugardes: Yeah, brother fine.
>
> Guim: No, no, because if that Honda is a total loss . . .
>
> Ugardes: Yes, yes, that Honda is a total loss (UI). Total loss.[7]

---

[6] To date, more than five persons have reported Garage 1 paying cash kickbacks to tow truck operators and tow truck owners for delivery of damaged vehicles.

[7] From review of the file, your affiant has determined that this accident ended up not being a total loss, but was instead just severely damaged consistent with the high value of the repairs.

*February 25, 2014.*

33. CS-1 reported that CS-1 had learned that, on February 25, 2014, **Jose Guim** had towed two vehicles to Garage #2 as a result of the assistance of MDPD Officer **Yuri Millan**. **Guim** reportedly told CS-1, during an unrecorded conversation, that Guim intended to pay **Millan** $400 for this assistance.

34. Investigators have retrieved a Florida Traffic Crash Report that documents **Millan**'s response to a traffic accident on February 25, 2014. This accident involved two vehicles, a 2010 Toyota and a 2010 Volkswagen. The report indicated that both vehicles were removed from the accident scene by O&U Towing at "Owners Request." Subsequent interviews of the drivers of both disabled vehicles have confirmed that neither driver contacted O&U towing for assistance. Both drivers stated that the tow truck appeared at the scene without explanation.

35. In response to a subpoena, Garage #2 has provided investigators with the two corresponding files that document receipt of both the Toyota and the Volkswagen. The first file for the Volkswagen has a photocopied tow bill for a wrecker service different than O&U. The second file does not have an O&U tow slip and appears to have been deliberately removed from the file (there is a tear on the photocopy of the check where the tow slip is routinely placed in other Garage #2 accident files). The salvage company paid $1,133.70 to Garage #2 for salvage of the vehicle.

## THE CONFESSIONS

*Elina Rodriguez.*

36. On May 2, 2014, investigators interviewed MDPD PSA Elina Rodriguez. During that interview, MDPD PSA **Rodriguez** admitted receiving cash payments from **Oriel Ugardes** in return for allowing **Ugardes** and O&U employees to illegally solicit business and tow vehicles from accident scenes. Since her initial interview, she has provided additional information. **Rodriguez** has been charged federally with conspiracy and is cooperating with the ongoing investigation.

37. Rodriguez has admitted receiving bribes from **Ugardes** since in or around 2009 through May 2, 2014. Rodriguez stated that she got to know **Ugardes** on the job. In the beginning, Rodriguez reported that she borrowed a small amount of money from **Ugardes**, who then started paying her in exchange for Rodriguez using her position to assist **Ugardes's** towing business. Rodriguez admitted that she would allow **Ugardes** and **Ugardes's** employees (O&U wrecker operators) to illegally solicit business from stranded motorists at Rodriguez's assigned accident scenes. Over time, Rodriguez stated that she would also assist **Ugardes** by using her MDPD issued laptop to access the MDPD database to search for accidents. Rodriguez would provide **Ugardes** the accident locations so that **Ugardes** or one of his drivers could get to the scene and solicit business. Rodriguez has indicated that, on average, she would be paid between

$100 and $300 for each wreck. Rodriguez estimates that she received at least $35,000 in cash payments from **Ugardes** between in or around 2009 and May 2, 2014 (when she was approached by the FBI).[8]

38. Shortly before she was interviewed by the FBI, Rodriguez indicated that **Ugardes** had been attempting to talk Rodriguez into loaning **Ugardes** her MDPD radio. MDPD had recently switched to encrypted channels, which made it impossible to learn about accident locations through use of a traditional scanner. Rodriguez stated she hadn't felt comfortable loaning him the radio, and that **Ugardes** told her that he obtained an encrypted radio from another police officer. Rodriguez did not know the name of the officer that had provided **Ugardes** the encrypted radio.

*Yuri Millan.*

39. On June 20, 2014, **Millan** was interviewed by investigators. After initially denying taking kickbacks, **Millan** then admitted receiving bribes. **Millan** stated that for the five-month period preceding the interview, **Millan** had been paid bribes in exchange for using his position to assist **Guim** and **Ugardes** tow vehicles. **Millan** said he was recruited by **Guim**, whom **Millan** had known for a number of years even before becoming a police officer. **Millan** admitted using his MDPD computer to provide **Guim** accident information regarding accidents that were holding. **Millan** stated he would only do this sporadically. **Millan** said that he provided up to 3 or 4 accidents a week, but sometimes providing none. **Millan** stated that he ultimately grew tired of providing **Guim** accident information all the time, so he instead provided **Guim** his (**Millan**'s) MDPD-issued encrypted radio. This radio allowed **Guim** and **Ugardes** to listen to MDPD encrypted radio traffic and identify accident locations. When **Guim** reported that he lost the MDPD radio, **Millan** stated that he met **Guim** and **Ugardes** at Tamiami Park to discuss the matter. Millan claimed that **Ugardes** and **Millan** offered him $3,000 cash for losing the radio. **Millan** said he refused the $3,000, but instead "borrowed" $1,000 cash. In total, over the 5-month period, **Millan** admitted that he "borrowed" approximately $2,000 to $3,000 from **Guim** and accepted another $500 to $600 in cash. **Millan** admitted that he never paid any of the "borrowed" money back.

### Other Miscellaneous Evidence

40. After the MDPD transitioned to encrypted radios, pirates were no longer able to use police scanners to learn the location of accidents. CS-1 reported that **Ugardes** was upset with this situation and would pay $5,000 for an encrypted MDPD radio. In April 2014, CS-1 reported CS-1 had learned that **Millan** would be paid $300 weekly for the use of **Millan** encrypted MDPD police radio. **Millan** would make the encrypted radio available for use by **Guim** or **Ugardes**, who were supposed to pick up the radio from **Millan**. CS-1 reported on various times that **Guim** or **Ugardes** would pick up the police radio in the mornings from **Millan**. **Guim** also permitted CS-1 to utilize **Millan**'s radio to locate accidents. Investigators then met with CS-1 and photographed the radio and confirmed that it was assigned to **Millan**.

---

[8] On her initial interview, Rodriguez admitted to a lesser total amount.

41.     On the morning of May 14, 2014, FBI Agents and TFOs conducted a surveillance outside **Millan**'s residence. Investigators watched **Millan** exit the front of his residence for a short period of time and then go back inside. A short time later, **Ugardes**, driving an O & U Towing wrecker, drove up to **Millan**'s residence, parked his vehicle, walked around the front yard, and then departed **Millan**'s front yard with a white bag. As Ugardes drove away, a TFO saw that the white bag had a black object sticking out that looked like a police radio. Law enforcement then stopped **Ugardes**'s wrecker and recovered a police radio which was later confirmed to be assigned to **Millan**.

42.     On May 20, 2014, **Millan** submitted a MDPD Offense-Incident Report which was recovered by the FBI. In the report **Millan** falsely stated that sometime between May 13, 2014, and May 19, 2014, he "lost the county issued handheld radio an unknown location. When [he] went to look for it to re-charge the battery, only the clip was on the gun belt. I looked for the radio within my house...." **Millan**'s report is inconsistent with the events that took place during the surveillance at Millan's residence and with what he told FBI Agents during his interview.

### Use of Interstate Wires.

43.     During the scheme and artifice described above, the conspirators used and caused multiple interstate wire communication in furtherance of the purpose of the conspiracy. For example, **Ugardes**'s cellular telephone was registered to T-Mobile's network. When a text message is sent or received by a T-Mobile cellular telephone, that text message is transmitted through a server in California. Thus, each time that **Ugardes** exchanged a text message with one of his coconspirators in Florida that message would cross state lines through use of the T-Mobile server in California.

44.     In regard to communication with Rodriguez, for example, on January 27, 2014, Rodriguez sent text messages to **Ugardes**'s cellular telephone that identified accident locations. On the following day, Rodriguez sent a text message to **Ugardes** warning **Ugardes** that there was a detective at her scene and telling him to park on the side and then to wait until the detective left the accident scene before approaching.

45.     **Ugardes** and **Guim** also text messaged frequently between themselves in reference to the scheme. For example, on January 24, 2014, **Guim** sent **Ugardes** a text telling **Ugardes** they need to pay ("give something") to **Millan** (pelotero) for the prior day. From MDPD records, investigators know that **Millan** worked an accident the day before. On February 13, 2014, **Ugardes** sent a text message to **Guim** to have **Millan** check an accident.

### Conclusion.

46. Based on the facts described above, your affiant respectfully submits there is probable cause to believe that, between in or around 2009, the exact date being unknown, and continuing through on or about June 20, 2014, Defendants **Yuri Millan, Oriel Ugardes,** and **Jose Guim** have knowingly and willfully conspired with each other and other known and unknown persons to commit an offense against the United States, that is:

(a) to knowingly and with intent to defraud, devise, and intend to devise a scheme and artifice to defraud Miami Dade County and its citizens of their intangible right to honest services by Miami Dade Police Department (MDPD) employees through bribes and kickbacks, and transmitting and causing to be transmitted certain wire communications in interstate commerce for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346; and

(b) to corruptly solicit and demand for the benefit of any person, accept and agree to accept anything of value from any person, intending to influenced and rewarded, as an agent of a State and local organization, government, and any agency thereof, in connection with any business, transaction, and series of transactions involving anything of value of $5,000 or more, within a one year period that said organization, government, and agency has received more than $10,000 under a Federal program, involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(1)(B);

(c) to corruptly give, offer, or agree to give anything of value to any person, with intent to influence and reward an agent of an organization, State government, and local government, and any agency thereof, in connection with any business, transaction, and series of transactions of such or organization, government, and agency involving any of value of $5,000 or more.

**FURTHER YOUR AFFIANT SAYETH NOT,**

*SA Donald P. Morin, II*
Donald P. Morin, II
Special Agent, FBI

Subscribed to and sworn before me on this
6th day of November, 2015, in Miami, Florida.

BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA